First Circuit. DAVID COOPER and CHARLES JACKSON *vs.* HIRAM AL-
DEN and others, Commissioners of Internal Im-
provement, and Mayor, &c., of the city of Detroit.

Cooper
*vs.*
Alden.

An injunction granted by a justice of the supreme court in cases where the statute authorizes
it, stands upon the same footing as if granted by the chancellor, and in either case it is com-
petent for the defendants in vacation, and before they put in their answer, to move to dissolve
the injunction for want of equity in the bill.

Purchasers of lots in the city of Detroit acquire no other or greater rights from the fact that
said city was laid out by the governor and judges of the late territory of Michigan, under
an act of Congress authorizing them so to do, than they would acquire if the same had been
laid out by an individual who had legally dedicated certain portions for streets and alleys.

Purchasers of lots bounded on a street or square, acquire a right, and are interested in the
preservation and appropriation of such street or square to the uses for which it was dedica-
ted, and the city corporation, without full and express authority so to do, have no power to
grant any portion of such public street or square to be used for any purpose destructive of
the ends for which it was originally dedicated.

Where land is dedicated to a particular purpose, and the city authorities have appropriated it
to an entirely different one, it affords ground for the interference of a court of chancery, by
injunction.

The corporation of the city of Detroit have no power except that which is derived from the
act incorporating the same, or the acts specially relating thereto.

Where the common council of the city of Detroit granted a lease of a portion of a public
street in said city, (though under a resolution of a public meeting of the freemen of the
city of Detroit,) to the commissioners of internal improvement, for the use of the state,
to lay a railroad track and erect offices, &c., upon, an injunction was granted to restrain
the commissioners from so doing.

The commissioners of internal improvement have no right, under the general powers con-
ferred on them, to appropriate a portion of a street in the city of Detroit for the purpose of
erecting offices and other buildings thereon.

This court has undoubted jurisdiction to interfere by injunction where public officers are pro-
ceeding illegally and improperly, under a claim of right to do any act to the injury of the
rights of others.

The bill in this case was filed September 20, 1838, and sta-
ted that complainant, Jackson, was the owner in fee of the
west half of lot number 43, and that Cooper, complainant, was
the owner in fee of the east half of said lot, and also the en-
tire lot 42, both of said lots being in section six, of the city of
Detroit, according to the plan of the city, made and adopted
by the governor and judges of the late territory of Michigan,
pursuant to the provisions of an act of congress for that pur-
pose.

That said lots were situated adjoining and fronting on a pub-

lic street called Michigan grand avenue, 200 feet wide; that said street was laid out and established as a public street and open space, not only for the free and uninterrupted use of all the citizens as a street, but for the ornament of said city, and more especially for the convenience, benefit, use and healthfulness of the lots adjacent to, and situated on said avenue. That complainants, and those through and under whom they claim, had been in the full, peaceable, quiet and uninterrupted possession of said lots, and of said avenue, as an easement for more than twenty-five years last past; that they gave a much greater price for the lots than they would have done, had they supposed they did not acquire a vested right in said avenue, as permanent and indefeasible as in the lots themselves; that they had expended large sums of money in improving said lots; had erected expensive buildings, and actually resided thereon with their families for several years.

That the mayor, recorder, aldermen, &c., of the city of Detroit, September 4, 1838, executed a lease to the people of the state of Michigan, reciting that,

"Whereas, pursuant to a call of the mayor of the city of Detroit, a meeting of the freemen was held at the city hall, in said city, on Thursday the second day of August, A. D. eighteen hundred and thirty-eight : and whereas, after said meeting was duly organized, and the object of the call explained, the following resolution was adopted by said meeting, viz.

"Resolved, That the common council of said city, be authorized to lease to the state of Michigan a space in Michigan grand avenue, between the city hall and Bates street, adjoining Bates street, sixty feet in width and extending one hundred and forty feet towards the city hall, for the purpose of erecting a brick building for a depot for passenger cars, and for other purposes connected with the operations of the central railroad; and, also, the privilege of laying a track or tracks, from the present termination of the railroad, in the most eligible manner to the aforesaid ground between Bates street and the city hall.

First Circuit.

Cooper
vs.
Alden.

"Now, therefore, be it known, that the common council of said city, in obedience to the resolution of the freemen of said city, above recited, so far as they have power and authority under the city charter and amendments thereto, and without the intervention of a jury to assess private damages, and in this manner so to do, do hereby lease to the people of the state of Michigan, all that space of ground in the centre of Michigan grand avenue, in said city, between the city hall and Bates street, sixty feet in width on the west side of Bates street, adjoining said Bates street, and extending one hundred and forty feet towards the city hall, for the purpose of erecting thereupon a brick building to be used as a passenger car house, and for railroad offices, connected with the operations of the Central railroad only: and the said common council, so far as they have power as aforesaid, do hereby also grant to the people of the state of Michigan, the other privileges in said resolution of the freemen above recited, contained for the purposes therein specified.

"It being always understood, however, and these presents are upon these express conditions and not otherwise, viz:

"That these presents and the privileges and ground hereby granted and leased to the people of the said state, shall continue and be in force so long as said ground and the buildings thereon to be erected, and said privileges shall be used and occupied for the purposes herein before specified and mentioned, and that as soon as they shall cease to be thus used and occupied, they shall all and singular forthwith revert to the mayor, recorder, aldermen and freemen of the city of Detroit, and these presents from thenceforth, be null and void.

"And upon the further condition, that no more than one track or railway shall be placed or made across Woodward avenue, from the present termination of the railroad, for the purpose of arriving at said passenger car house:

"And upon this further condition, that in case the people of said state, or their agents, or the commissioners of the Central railroad, or the acting commissioner thereof, do not, within one month from this date, notify the common council of said

city of the acceptance of this lease and privileges hereby grant-
ed, subject to the provisions, conditions and understanding
herein before and herein after contained, or in case the said
people or their agents, or said commissioners or commissioner,
or his or their successors in office, do not, within the period of one
year from and after the date of such notification to said com-
mon council, have erected and completed the aforesaid brick
building, and in use for the purposes aforesaid; then, and in
each of these cases, these presents shall cease, be inoperative,
null and void.   And these presents are upon this further ex-
press condition and understanding, and not otherwise, viz: that
the said state of Michigan shall and will, from time to time,
and at all times save harmless and keep indemnified said com-
mon council, and every member thereof, and the mayor, re-
corder, aldermen and freemen of the city of Detroit, of and
from all damages, sums of money, costs, charges, troubles,
suits and expenses, which they, or any of them, shall or may
at any time hereafter be put unto, by being compelled to pay
damages, or sums of money to individuals by reason of said
common council having executed these presents, or on account
of said space of ground and privileges, hereby granted, being
used or occupied as aforesaid.   In testimony," &c.

That if said road should be constructed and laid down as
contemplated, it would pass along the entire front of complai-
nants' dwelling houses and premises, on Michigan grand ave-
nue, and near to the same; and that if the building contem-
plated by the lease should be erected, it would greatly in-
cumber said avenue, and block up and obstruct the free use
of the same, and extend across the entire front of said lots, to
the great annoyance and damage of complainants.   The bill
charged that the lease was made without authority; it further
stated that the commissioners of internal improvement did, on
or about the same day the lease was made, accept the same in
behalf of the people of the state of Michigan, and by a resolu-
tion of the board, directed the acting commissioner on the cen-
tral railroad, to go on and erect the buildings, and lay down
the track of the railroad as contemplated in the lease, without

First Circuit. providing any compensation whatever for complainant's dama-

Cooper
vs.
Alden.

ges; that Hiram Alden, the acting commissioner, had employed engineers and other persons, and actually commenced the construction of said road and buildings, and threatened to continue the same; that the necessary grade for said road would elevate the same from one to three feet above the general level of said avenue.

The bill prayed an injunction to restrain the commissioners from constructing the road and erecting the buildings, in said Michigan grand avenue, &c.

Upon proof of the sickness of the chancellor, an injunction was granted, according to the prayer of the bill, by the Hon. George Morell, one of the justices of the supreme court, September 20, 1838.

A motion was now made to dissolve the injunction for want of equity in the bill.

P. MOREY, Attorney General, for defendant Alden.

1. The complainants do not show such rights as will authorize the court to interfere in their behalf by injunction, nor such a case as will sustain a decree.

2. If the court should be against us on the first point, then we say, that by their own showing in the bill, they have an ample and complete remedy at law for the injury complained of; for if they have rights to sustain this proceeding, they must have sufficient to sustain a suit at law for the trespass; or, if their property is injured, they can appeal to the appraisers under the provisions of the 15th section of the act for the regulation of internal improvement, &c., *page* 197, *session laws of* 1837.

3. By the provisions of the 20th section of the act relative to the city of Detroit, approved April 4, 1827, and the 1st section of an act to amend the same, approved June 29, 1832, the common council are vested with full power and authority " *to make or alter*" *streets* and " generally to do and perform under the by-laws and ordinances or other directions of the common council," whatever *may be for the regularity, public health, and convenience of the city*. ( *See pages* 10 *and* 25 *of*

*the pamphlet collection of the by-laws and ordinances of the city,* First Circuit.
*edition of* 1836.)   And by the lease set out in the bill, all this
power is delegated to the board of internal improvement.
This, it is contended, must operate as an estoppel of any claim
of the complainants, and as a relinquishment of damages by
the city of Detroit; and on this ground, it is contended there
is no equity shown in complainants' bill, or rather that their
own showing divests them of a right to interfere.

Cooper
*vs.*
Alden.

4. But conceding all other grounds, it is still contented that
the *"right of eminent domain,"* under our constitution and laws,
must remain with the sovereign power, the people; and that
the defendant, Hiram Alden, acting commissioner of the cen-
tral railroad, who appears for the purpose of making this mo-
tion, *was but acting as the agent of the people in the exercise of
this right,* in doing the acts complained of in the bill, and con-
sequently that no court can interfere with or restrain *him and
his associates, in the exercise of the power thus delegated to them
by the sovereignty of the state.*

It is urged that this right of *" eminent domain"* was intended
to be exercised by the legislature, and that it is fully delega-
ted to the commissioners of internal improvement by the 15th
section of the act for the regulation of internal improvement,
and for the appointment of a board of commissioners, approved
March 21, 1837. (*See session laws of* 1837, *pages* 197 and 198.)

The following authorities are referred to as fully sustaining
the construction contended for: *Rogers* vs. *Bradshaw,* 20 *John.
R.,* 735, and cases cited; *Wheelock* vs. *Young and Pratt,* 4
*Wend.,* 647; *Beekman* vs. *Saratoga and Schenectady R. R. com.,*
3 *Paige Ch. R.,* 72, 73, and cases cited; *Varick* vs. *Smith and
Attorney General,* 5 *Paige Ch. R.,* 137; *the Mohawk bridge
com.* vs. *the Utica and Schenectady R. R. company,* 6 *Paige,*
560 *to* 565; *and the Charles river bridge com.* vs. *the Warren
bridge com.,* 11 *Peters R.,* 536 *to* 583, and the cases cited.

5. It is contended also, that the allegations in the bill show that
the people of the state of Michigan, the grantees in the lease,
which the complainants seek to have delivered up to be can-
celled, should have been made parties to the bill, and that the

injunction should be dissolved because their rights cannot be
infringed in a case to which they are not parties.

WOODBRIDGE and BACKUS, contra.

W. WOODBRIDGE.

The injunction was allowed from and upon the *case* presented by the *bill, which is sworn to.* The bill was filed and injunction allowed about the 20th September. Abundant time has, therefore, been given to defendants, by answer, to exhibit a *new case*, or to vary that we present. But this has not been done. The case now before the chancellor, is *identically* the same as that upon which the injunction was allowed. The parties and the chancellor *cannot* travel out of it; and after the expiration of thirty days, the chancellor is called upon to review and *reverse* his decision, without the presentation of any one additional fact, while yet at chambers; when out of term, a question is decided by a judge, it is in general, *incompetent*, and certainly contrary to all legal analogies, to require such review and reversal, *until the next regular term.* If it be the *same* judge, the *application* is not very courteous; if it be *another* judge, considerations of delicacy, *strengthen* the objection. If answer had come in, or if in any way without answer, the *case* had been *varied*, (which, without answer, I apprehend could not be,) then such objection would be obviated. But when all is *identically* the same, then, if the injunction were dissolved to-day, the complainants may, with *equal propriety* certainly, make application to-morrow, to *reinstate* the injunction. The precedent would be a *bad* one; the course would lead to great inconvenience and *uncertainty*, as regards both the chancellor and the action of parties, (for what reliance can there be placed upon a decision at chambers?) and according to all legal analogies, *irregular*. If a *new* or a *varied* "case" had been presented by the coming in of *answer*, very good reasons may be urged for acting in vacation upon such motion.

That the complainants have rights, and are entitled to the protection of the law, no doubt can be rationally entertained.

Their lots and dwelling houses border upon Michigan grand avenue. This piece of public ground, is 200 feet wide. It is situated in a part of the city, designed rather for healthy and desirable residences, than as a place for mercantile or other business. Its great width, manifestly shows its dedication to the uses, not merely of a public highway, but as a place of public resort; as a public walk and an ornament to the city. It is doing violence to common sense to suppose that the owners of lots and residences bordering upon it, have not an interest in its preservation as such. No person conversant with the process of the settlement of new countries, would hesitate a moment in avowing it as an universal sentiment, that every person buying a lot in any part of a newly laid out village or town, acquires thereby, an interest and a right, in the preservation of every street, public square and avenue, and their continued application to the uses to which they were originally dedicated; and the authorities abundantly sustain the proposition as the law of the land. The case of *Weyman* vs. *the Mayor, &c.*, 11 *Wendell*, 486, and of the *City of Cincinnati* vs. *Lessees of White*, 6 *Peters*, 431, and all the most respectable courts, it is believed, affirm the doctrine of the existence of such right; and that it *passes* to each vendee, *with his grant and as a part of it*, as well as to the public; and should any city corporation undertake to apply such street, public ground or common, to *any use* other than that to which it was originally designed, a court of chancery would compel such corporation, as *trustees*, to desist, and apply it as originally designed.

Now this right of the complainants, their privileges, franchises, incorporeal hereditaments in the premises, are disturbed by the defendants. They are threatened with total destruction. This public ground is sought to be applied to purposes totally destructive of *those* to which it was originally *dedicated* by the United States, (the original proprietary owners of the soil, as well as the supreme political sovereign, for the time being, of the country.) Instead of a free and salubrious atmosphere, and a beautiful green before their doors, a public

walk, uninterrupted by violence, shaded by trees and ornamented by bordering public and private buildings, (as such public grounds usually are,) there are to be substituted the smoke and dust and fire of noisy steam engines, passing by their doors; putting in jeopardy the lives of such children and others, as may venture from their doors; the crowd and bustle of congregating passengers, and baggage and merchandize; and with all, the positive inhibition from passing, at pleasure, across the avenue, from one side to the other; or of riding or walking along or upon the railroad, its paths or embankments, under the severe statutory penalties of fine and imprisonment. And all this, according to the case made by the bill, (to which the parties, in the *present* stage of the matter, *must* remain confined, without any adequate or legal authority.   Deep ditches are to be dug, the surface of the earth *graded* into *every* irregularity, and a large building, sixty by one hundred and twenty feet, suitable for artizans, work shops, and storehouses erected, obstructing the prospect and destroying the beauty of this public ground, in the progress of creation.

To protect against such infringements of our rights and to inhibit the erection of these works and buildings, until, at least, some right or justification can be shown upon answer or plea, the complainants appeal to the chancellor and obtain an *injunction.*   The defendants now, *at chambers,* move, and without filing plea or answer, for the dissolution of such injunction, and object, *First,* That chancery has not jurisdiction; the remedy is at law, where, if there be right, adequate damages may be obtained.

To this objection it is answered, that the nature of the injury goes to the total destruction of the right, and that the damages *cannot* well be estimated at law.   It is the course of chancery rather to *prevent* the injury, where it goes to the destruction of the right, before it is yet consummated, than to turn the party over for damages, which cannot, any how, well be measured.   It is upon this principle that injunctions issue to prevent the erection of a house or a wall against any window, until the right can be tried, although, *if erected,* it would not

order it pulled down until the right was tried. (*See* 1 *Ves.*, 543.) So chancery will inhibit the digging of ground, though a mere trespass, for which damage would be obtained, 1 *Ves.*, 188; but it is too late to question the jurisdiction of the court. The case of *United States Bank* vs. *Osborne and others*, 9 *Wheat.*, 733, was far more open to objection than this case.

*Second,* It is further objected that the acts complained of are done and being done under the authority and by the order of the constituted authorities of the state.

To this, it is answered, *First,* That *this* is travelling out of the *case,* which *negates* such pretensions, and if the fact *were* so, it should be shown by answer or plea.

But suppose it were, as thus irregularly pretended, we answer, *Second,* The rights and franchises sought to be destroyed, were granted to us by the United States, as the owners of the soil, as well as the political sovereign of the country, and that, under our constitutions of government, such grant *cannot* be revoked without our consent, and we refer to the case of *Fletcher and Peck, Cranch* 87. (*See* 2 *condensed Rep. U. S.*, 308, *and note,* 325 *to* 332.) That, although that political sovereignty may have changed hands, and now be vested in *the state,* yet that the same incapacity attaches, under the constitution of the United States and of this state, to the successor of the former sovereign, and refer to the *Dartmouth College case,* 4 *Wheat.,* 518, where it was decided that grants of franchises and incorporeal hereditaments by the government of England, *could not now* be revoked, against consent, by its successor, the sovereign state of New Hampshire.

*Third,* But it is further persisted in by defendants, that the acts complained of, are the acts of the *legislature,* whose power is *transcendent;* that private right and private property must always be holden subservient to public necessity, and public interest and convenience; that upon the devolution of the powers of sovereignty upon the new state, such new state necessarily became vested with the power of making roads wheresoever it pleased, and for such purpose to take private property; that in any pressing exigency, (of which the state authori-

First Circuit. ties must judge, as in case of 'war,) a fort might, by them, be
Cooper    again erected here, and the public and private buildings and all
*vs.*     the ornaments and property of this city be levelled for a pa-
Alden.    rade ground.  That such powers are among the attributes of
sovereignty, lodged with the legislature, which legislature will
alone judge of the necessity, carry its mandate into execution,
and without any other responsibility than that which it owes
" to those who placed them there."

To this it would likewise be a sufficient answer *here*, to say
that it is traveling out of the case; since none of these things, *as
yet, appear* in it, nor is it consistent with judicial propriety, with-
out answer or plea, to argue from facts which do not appear
in the cases before the court.  But as matters of fact *and of
law*, it does not appear, nor can it, that the legislature of Michi-
gan has authorized any of these things.

The eastern terminus of the Detroit and St. Joseph railroad,
had been established by the company, of which the state be-
came the assignee; and whether correctly or not established,
the legislature has expressly confirmed it.  (*See Acts of* 1837,
*page* 131, *sec.* 2.)  And although it has given to the board,
upon condition, power to extend the railway down Woodward
avenue to Atwater street, (*See Acts of* 1837–8, *page* 291,) yet
no authority can be found to extend it into Michigan grand
avenue; nor among the general powers conferred upon the
board, can we discover any which could authorize them thus
to close any public highway, and still less any public avenue
of the city; nor indeed, for reasons already alluded to, and be-
cause every corporate body is confined to the exercise of pow-
ers expressly granted, can the corporation of the city legally
execute such a lease as in the bill described.  (*See* 2 *Cranch*,
127; 1 *United States Condensed Rep.*, 371, *and note.*)  But if
the facts had been as represented by defendants, it is still im-
possible that the doctrines advanced by them, should be ac-
quiesced in.

By the grant of general legislative power to the legislature
of Michigan, the people, in their constitution, say, the govern-
ment have given that body the right of taking all private pro-

perty, whenever the public necessity, (as in case of war,) or public convenience, (as in case of roads,) require it; that the legislature have the exclusive and uncontrolable power of judging and determining of the existence of such public necessity and of such public convenience; that such high discretionary power *must* exist in every government; that with us, it is vested in the legislative body, and that our guaranty against the abuse of such high power, consists in the responsibility of the legislators to those who appointed them, &c.

Now, without dwelling upon doctrine so bold and so dangerous, it may be sufficient to observe, that it cannot escape observation, that such political maxims, when applied as the *ordinary rule of action, at once annihilate all* distinction between governments which are of limited and defined powers, and whose different branches are distributed into various independent and co-ordinate bodies, each deriving all its powers from a written constitution, formed and adopted by the people in their sovereign capacity, (and principally for the very purpose of restraining those different authorities,) and those governments in which there are no constitutions. Of the parliament of Great Britain it may be properly said, that the only guaranty for the safety of the rights of private property, consists in " the responsibility of the legislators to those who appointed them;" but if the same maxim is to be enforced here, of what use or avail are written constitutions here ?

If a majority of our legislature, in the exercise of the high power alluded to, should think proper to declare that " the public necessity" required that your vested rights of property should be taken from you, and that " the public convenience" required that a turnpike road should be opened through your parlor, who, upon the maxim contended for, can gainsay it ? Of what use to you, then, are the constitutional guards of the governments of the United States, and of this state, for the rights of private property ? If it be answered that this is arguing upon the *possible* or *probable* abuse of power, then I answer, that it was to guard against such possible or probable abuse of power, alone, that such guards, as exist there, were

First Circuit. inserted in the constitutions of the United States and of this
Cooper
vs.
Alden.
state. *Public necessity!*—so a Roman senate declared—required, that Julius Cæsar should be made dictator, and he became such. The legislative power of France, from principles of public necessity and expediency, deemed it proper that Napoleon should be first consul—who could prevent it? The Rump parliament thought that the "public convenience" would be best promoted by appointing Oliver Cromwell to be protector, and "being responsible ever to those who appointed them," they so declared!

H, T, Backus submitted a written argument.

The Chancellor.—A preliminary objection is made by the counsel for the complainants, that the injunction in this case, having been allowed upon the bill, as sworn to, and no answer having been put in, nor the state of the case varied, it is not competent, or according to the course of practice, to move to dissolve on the same state of facts in vacation.

Our statute (R. S., 376, sec. 103,) authorizes the justices of the supreme court severally, to "exercise the powers of the chancellor, with respect to the granting of injunctions," in certain cases. An injunction granted by a justice of the supreme court, in cases where the statute authorizes it, stands upon the same footing as if granted by the chancellor, and in either case, it is competent for the defendants in vacation, and before they put in their answer, to move to dissolve the injunction for the want of equity in the bill. (*See Minturn* vs. *Seymour*, 4 *Johns. Ch. Rep.*, 173.)

It is urged by the counsel for the complainants, that the mayor, recorder and aldermen had no authority to make the lease to the commissioners of internal improvement; that the city of Detroit, having been laid out by the government of the United States, and lots purchased with reference to the plan of the city, adopted by the government at the time of laying out the same, the purchasers have acquired vested rights of such a character, that the plan of the city, thus adopted and established, cannot be changed or in any manner interfered

with, even by the full and express authority of legislative power, and that the exercise of such a power is regarded in the light of a revocation of a grant, or the violation of the obligation of a contract, and the cases of *Fletcher* vs. *Peck*, and *Dartmouth College* vs. *Woodward*, are cited in support of this doctrine. I cannot view the question in this light. I am unable to perceive that the United States, by authorizing their trustees, the governor and judges, to lay out a town, intended to convey or did convey, any other or greater rights to purchasers of lots in the premises, than would be acquired by purchasers of lots where an individual had laid out a town or city, and had legally dedicated certain portions for streets and alleys, on which lots were bounded. But it is undoubtedly true that purchasers of lots bounded upon a street or square, acquire a right and are interested in its preservation, and the application of such street or square to the uses for which it was dedicated; and should any city corporation, without full and express authority so to do, undertake to grant any portion of such public street to other individuals, to be used for any purpose which should be destructive of the ends for which such street was originally dedicated, such grant would be void. It is not necessary to discuss at present, the extent or the limits of the legislative power to authorize an improvement in a city or town, by the change of a plan, or a mere easement as a right of way for a railroad, or even the absolute appropriation, for the purpose of erecting permanent public buildings.

If the ground had been dedicated to a particular purpose, and the city authorities had appropriated it to an entirely different one, it might afford ground for the interference of a court of chancery to compel an execution of the trust, by restraining the corporation, or causing the removal of the obstruction. (*See Barkley* vs. *Howell's Trustees,* 6 *Peters' Rep.,* 507.)

It is contended that the common council of the city of Detroit, in granting the lease set out in the bill, have exceeded their powers; that no such authority has been given to the city authorities by the statutes creating and governing the cor-

First Circuit.

Cooper
vs.
Alden.

poration, and that the act making such grant is void, and can in no manner effect the rights of the complainants.

The authority of the common council to lay out, change or alter any street or highway, is contained in the second section of the act entitled "An act to amend an act entitled 'An act relative to the city of Detroit,' approved June 29, 1832," which provides "that when any street, lane, alley, side walk, highway, water course or bridge, is proposed to be laid out, established, opened, made or altered by the said common council in said city, due notice shall be given to all persons whose property will be affected thereby, and a jury shall be drawn," &c., "who, after being sworn, shall go on to the premises on which it is proposed to lay out, establish, open, make or alter any street, lane, alley, side walk, highway, water course or bridge, as aforesaid, and from an actual view of the premises, shall, upon their oaths, determine whether the public improvement or convenience require the thing proposed should be done, and if they agree in the affirmation, then they shall proceed to assess the damages, if any, upon any property affected thereby, respectively, to each owner or occupier thereof, and the said damages shall be paid before such improvement or alteration shall be made, and within one month after the verdict, which shall be returned to, and recorded in the mayor's court shall have been rendered," &c.

The other sections of the acts relative to the city of Detroit, referred to, have no application to the present case. The corporation of the city of Detroit have no power, except that which is derived from the act incorporating the same, or the acts specially relating thereto. (*See the People* vs. *the corporation of Albany*, 11 *Wend.*, 544; *Oakley* vs. *the Trustees of Williamsburg and Monroe*, 6 *Paige Rep.*, 262.)

Does the statute above referred to, authorize the corporation of the city of Detroit, by a vote or lease, to make a permanent appropriation of a part of one of the streets of the city for the purpose of erecting a large and permanent building, and to the great injury of individuals? Is it such an alteration or charge of the public street as is contemplated by the act? The

corporation have not pretended to follow the forms of law.

It is so alledged, and their acts show it to be so. The lease is carefully guarded. It says: "the common council so far as they have power and authority, under the city charter and amendments thereto, and without the intervention of a jury, to assess private damages, and in this manner so to do, do hereby lease to the people of the state of Michigan," &c. This lease purports to have been executed by virtue of a resolution of a public meeting of the freemen of the city of Detroit. But this cannot vary the case; a portion, or even a majority of the citizens cannot legislate upon the rights of others in this way. It is competent for individuals to stipulate as to their own rights or their own property, but they cannot in this way, interfere with the rights or property of others.

The hasty conclusions of a public meeting, regulated by no forms or rules of proceeding would be substituted for the safe guards of our constitution and laws. It would be deserting at once the learning and the labors of the statesman, and law-givers who have endeavored to define and protect the rights of property among other rights, and submitting all to the passions or interests which should prevail at the moment. If it is competent to lease a street in this manner to be occupied for this *purpose, it would be for any other purpose;* and whoever should happen to be the individual whose dwelling was approached in this manner, would be fully sensible of the danger and inconvenience of such an exercise of power. It is not in the power of the city authorities, at all events, under the existing laws, to make such a grant to the injury of any individual; and the complainants may properly treat this proceeding, as far as it interferes with their rights, as void, and as conferring no authority upon the commissioners of internal improvement to erect the building complained of, to their injury. But it is insisted that if it should be found that the common council exceeded their powers in granting the lease in question; still the commissioners of internal improvement have full authority to do the acts complained of by the bill.

This presents a difficult and important question.

By the thirteenth section of the act for the regulation of internal improvement, &c., (*Session Laws of* 1837, *page* 196,) the board of internal improvement are authorized and required to establish the rates of toll, &c., and " to erect all such toll houses, weighing scales, offices, and other edifices; and also to purchase such grounds for the convenience thereof as they may think necessary for the convenience and profitable use of their canals or railroads," &c.

The 15th section of the same act, provides that " the said board are hereby empowered to receive any cessions or grants for the use of the people of this state, from any person or persons, of any lands *through* which any line of canals or railroad or other *public work*, shall have been located. Said board of commissioners, and every acting commissioner under their direction, shall be, and they are hereby, vested with all the privileges and powers necessary for the location, construction and keeping in repair all canals, railroads and other improvements of which they may have charge; and the said board, their agents or those with whom they may contract for working or repairing any of said works of internal improvements, or any parts thereof, may enter upon, use and excavate any land which may be wanted for the site of the same, or any other purpose which is necessary in the construction or repair of any of said works," &c."

It is said, by the counsel for the defendants, that these two sections give the commissioners full power and lawful authority to do all that is alledged in the bill, they have done, or contemplate doing.

Have the legislature, by these general powers, authorizing and requiring the commissioners to erect toll houses and other edifices, and to purchase the lands necessary for the convenience thereof, &c., authorized them in the manner complained of by the bill, to appropriate and occupy a public street for a permanent building, 140 feet long by 60 feet wide, to the great damage, as alledged in the bill, of the complainants ?

After the most careful examination, I have been led to the conclusion that the legislature did not contemplate conferring

this power on the commissioners, and that no such power is, by the act, conferred.

In order more fully to understand this question, it may be well to refer to the laws of the state of New York upon this subject, and the construction which has been given to the powers of the commissioners conferred by those laws.

By the 16th section of the revised laws of New York, full power is given "to erect on, and take possession of, and use all lands, streams and waters, the appropriation of which for the use of such canals and works, shall, in their judgment, be necessary." By the 19th section of the same law, it is provided "that whenever for the purpose of constructing a canal or making any extraordinary repairs or improvements, it shall be deemed necessary by the canal commissioners having charge of the work, to discontinue or alter any part of a public road on account of its *interference* with the proper location or construction of such work, he shall make or direct to be made, such discontinuance or alteration."

By the 24th section of the same law, the board of commissioners are authorized to erect such toll houses, offices and other edifices, and purchase such grounds for the convenience thereof, as may be deemed necessary for the profitable use of the canals," &c.

It would seem, then, that the legislature of the state of New York, only contemplated the discontinuance or *alteration* of any public road in case of its interference with the proper location or construction of the canal, repairs or improvements, and deemed it necessary to authorize it, by special authority, so to do. The general powers given to the commissioners in this act, are substantially the same as the powers conferred upon the commissioners of our state by the act above referred to. For the purpose of offices or edifices, I am inclined to believe that the laws of New York contemplate the acquisition of lands by purchase or grant, only. It certainly does not contemplate occupying a highway, in a case like the one now before this court; but only in cases where the highway shall interfere with the public works.

First Circuit.

Cooper
*vs.*
Alden.

By the 13th section of the act of this state, before referred to, the commissioners are authorized to construct all houses and necessary edifices, &c., and to purchase lands for the convenience thereof, &c.; and it is urged that by the general powers contained in the 15th section of the same act, it is competent for the commissioners to appropriate a part of one of the public streets for the purpose of erecting thereon the proposed edifice, and may extend the railroad some twenty rods, as appears from the plat exhibited, from its present termination, and directly away from the route, and not as a connecting link between its points of termination. Can it be fairly inferred from the act, that it was contemplated to authorize the occupation and obstruction of highways for public buildings, in this way?

I cannot view the powers conferred by the 15th section in any other light than as applying to cases where it became *necessary* to appropriate property, and interfere with private rights, in carrying out the great objects of the law *to connect the two points of termination by a continuous railway*, and that the legislature did not contemplate or intend to confer the power to construct lateral ways to the distance here contemplated, and there appropriate a public highway for the purpose of a large permanent building for car houses and offices.

The strongest case to be found in support of the exercise of such broad powers, is the case of *Rogers* vs. *Bradshaw*, 20 *Johns. Rep.*, 735. In this case, where the route of the canal interfered with a turnpike road, the supreme court held that the commissioners were not justified in placing the road on adjoining lands, although it was proved in the cause that the one or the other must yield. On appeal to the court of errors, it was held that the general authority to discontinue a public highway included a turnpike; and, also, that under their general powers, it was competent for them to make this diversion of the turnpike from the necessity of the case, and that the legislature must have intended to confer this power, which was necessary to carry their general powers into effect. The court say: "the turnpike road was *unavoidably encroached* upon by the canal. Another road was *indispensable* before the

canal was commenced, and the land taken was *necessary* for First Circuit.
the road; and further, it is very certain the improvement of
the canal at this place could not be prosecuted without the
road."

Cooper
*vs.*
Alden.

Is it to be inferred from the reasoning in the above cited
case, that the general provisions of our statute above cited,
reach a case like the present? • Here the proposed erections
are manifestly not absolutely necessary to carry into effect the
general powers of the board of commissioners, but the road is
extended to a distance from the line of the railroad, and the
public street in front of the dwellings of the complainants per-
manently appropriated,

Would the court, in the case above cited, have construed
this as coming within the meaning of the statute? It is be-
lieved not.

But it is said the discretion is vested in the board of commis-
sioners, and that no other tribunal should interfere. This is
*probably the correct view of the exercise of the powers* clear-
ly given them by law, and the exercise of which are necessa-
ry to carry out the objects contemplated by the act. But is
it true, that by virtue of their appointment, they may exercise
unrestrained power over the property or rights of others, and
that no remedy exists but an appeal to the legislative power?
This would be subverting and overturning one of the first prin-
ciples of our government.

A liberal construction of the powers the board of commis-
sioners have granted to them, and necessary for the important
objects of their appointment, should be given; but if those
powers are exceeded, to the injury of the rights of individuals,
the courts, of course, when appealed to, must hear and de-
cide.

This court has undoubted jurisdiction to interfere, by in-
junction, where public officers are proceeding illegally or im-
properly, under a claim of right to do any act to the injury of
the rights of others. (*See Mohawk and H. R. R. Co.* vs.
*Artcher*, 6 *Paige Rep.*, 88; *Oakley* vs. *Trustees of Williams-*
*burg, Id.*, 264; *Gardner* vs. *Trustees of the village of Newburg*,
2 *Johns. Ch. Rep.*, 162; *Belknap* vs. *Belknap, Id.*, 463.)

First Circuit.

Cooper
vs.
Alden.

The commissioners would not, perhaps, be trespassers unless they acted in bad faith; but when this court is appealed to, to protect the rights of parties, I know of no rule nor of any reason that will excuse it from adjudicating upon the law and the rights of these parties, as it would be compelled to do in every other case.

This, then, being the view entertained by the court, the question recurs, have the powers, attempted to be exercised by the board of commissioners been granted by the legislature? If this extension from the line of the road, and the car house and offices, &c., proposed to be erected, are authorized by the act, what is the limit of the powers of the commissioners? If it may be extended twenty rods; it may, upon the same principle, be extended one hundred rods. If the street in front of the residences of these complainants, may, by virtue of these general powers, be occupied for the purposes here contemplated, and there is no remedy; I can see nothing to prevent the occupation of the street in front of the residence of any other individual, for a furnace for the manufacture of engines, and an other for a shop for the manufacture of cars or carriages, for store houses or for a dwelling house, for the residence of the receiver of tolls. I cannot well perceive where the limits of this implied power are to be found. It is a conclusion from which I cannot escape, that the legislature, by the general term of canals, railroads and other improvements, and authority to occupy any lands wanted for the site thereof or for any other purpose *necessary* in the construction and repair of any of said works, did not intend to confer powers of the kind here claimed; but the term " other improvements," must have reference to the improving the navigation *of rivers* and the various works of internal improvement under their charge.

That the legislature did not contemplate, after authorizing and requiring the board to build edifices, &c., and to purchase such lands as were necessary for the convenience thereof, giving power to occupy lands and *highways* without consent or purchase in the manner here complained of; and that lands,

&c., were only to be taken against the consent of the owners

on the grounds and for the reasons for which such powers are usually given, from the *necessity of the case*, where the taking is necessary to carry into effect the great general objects in view. Such has been the course in New York and elsewhere, so far as I have been able to ascertain.

The right of the legislature to grant such powers of appropriating lands or highways for the erection of offices, edifices and other public buildings of the kind here contemplated, it is not intended now to discuss; but if such powers are granted, it is but reasonable to presume it will be definitely done as in the state of New York, and as was done by our legislature in extending the Central railroad down Woodward avenue, in the city of Detroit, and not by implication, and with proper safe guards.

It has been urged that the statute of March 20, 1837, section 2, required that the surveys of the several routes should be first made; that notice should then be given, and after hearing those interested, the commissioners should then proceed to establish such routes, and file in the office of the secretary of state, accurate plans of such surveys and locations. That, as it is alledged in the bill, and there being no answer, of course no denial, that the extension complained of, was ordered by a resolution, merely to make this extension according to the terms of the lease, and alledged to have been done without law or right, and without observing the mere forms of law; that the proceeding is irregular, and the parties cannot show it to have been legally done by reference to the statute merely, but must show affirmatively and positively, by way of answer, that they have pursued its forms and kept within the powers granted.

After the views expressed on other points in this case, it may not be very material for the purposes of this motion to decide this question. But, as it may be convenient as a question of practice, it may be proper to express my views upon this point. This is a motion to dissolve an injunction without answer, and for want of equity in the bill.

So far as the statute, which is a public law, goes to show

that the acts of the commissioners, as set out in the bill, are within their powers, and to be exercised in the manner therein stated, so far it is competent to show by it, they are lawfully authorized to perform the acts they are alledged to have performed, and that the complainants have no just cause of complaint, and that hence results a want of equity in the bill.

It has been further said in the argument, that the legislature, by their act of April 6, 1838, have themselves put a construction upon the powers of the commissioners, and that further legislation was necessary to authorize a further extension of the railroad from its present termination.

This act provides that the commissioners are hereby authorized, with the consent of the common council of the city of Detroit, to extend the tracks of the Central railroad from its present termination down Woodward avenue to its intersection with Atwater street, and thence each way along said Atwater street as far as said commissioners may deem best for the public good, &c.

This may not be of decisive consequence in the decision of this question, but it certainly may be regarded as confirmatory of the views heretofore expressed of the proper construction of the general powers of the commissioners. The commissioners themselves, by asking and obtaining a lease of the city, and by the uncontradicted allegations of the bill, acting in pursuance of it, and making it the basis of their proceeding in this matter, seem to have taken the same view of their powers.

But it is said that whatever views may be taken of the powers under which the commissioners acted, still the complainants have not made a case of such an interference with their rights, as calls for the interposition of this court by injunction.

It must be remembered that the allegations contained in the bill are not denied, and that, for the purposes of this argument, they must be taken as true, as admitted.

In regard to the injury, the bill alledges, in substance, that the complainants, and those under whom they claim, have been in possession for more than twenty-five years; that the complainants have laid out large sums of money in erecting build-

.ings, and preparing residences for themselves and their families; that the obstructing said street by buildings and permanent fixtures, would render the complainants' premises uncomfortable, inconvenient and unsafe, in proportion as the said street should be contracted or obstructed; and that, should said avenue be permanently contracted, their plans of making said premises a place of residence, would be wholly defeated, and they would be compelled, to their great loss and damage, and in violation of their vested rights, either to suffer hazard, inconvenience, annoyance, and wrong, or to abandon their improvements, made on said premises, and seek elsewhere a place of residence.

That if said building shall be erected, as contemplated by said lease, it will greatly encumber, block up and obstruct the free use of the same; and will extend across the entire front of lot 42, and nearly all of the eastern half of lot 43, the property of the complainants, to the great annoyance and damage of the vested rights of complainants and other proprietors of lots on said avenue. That the board of commissioners have directed said building to be erected, &c., to the great wrong and injury of complainants, without pretending to provide any compensation for the great damages the complainants would sustain thereby, and without pretending to pursue any of the mere forms of law. That defendants, or some of them, have commenced breaking up the streets, &c., and that they fear, unless restrained, they will go on and erect said building, dig up and encumber said avenue, to the great and irreparable loss and damage of the vested rights of complainants. That the street, as they believe, must be elevated from one to three feet, &c.; that they will be deprived of all passage, except at the peril of the lives and safety of themselves, families and property, by reason of the cars, engines and other vehicles passing and re-passing upon said railroad, and collected about said contemplated depot; and that said railroad and building will be a great and intolerable nuisance to the said complainants' said premises, and render the same wholly unfit and unsafe as a place of residence for the complainants and their fami-

CASES IN CHANCERY.

First Circuit. lies, and that their premises would be in danger of fire from engines passing and being stationed so near them, &c., &c.;
Cooper vs. Alden.
with other allegations of similar import, and to which it is not necessary further to refer. The foregoing are referred to, merely to show the character of the averments in the bill, and to test the question whether such a case is made, which standing uncontradicted, that the court is bound to interfere.

It is said that as there is a plat accompanying the bill showing the extent of the obstruction contemplated, that this court can, without denial of the strong allegations of the bill, which are sworn to by the complainants in this cause, infer that they are mistaken in their views, and that they do not sustain such an injury as they have alledged. This would be going quite too far. The substantial allegations of the bill must be held to be true until denied. Is there, then, such a case made as renders it the imperative duty of this court to permit the injunction allowed by the judge of the supreme court, to stand until an answer?

Of this, if the most respectable authorities furnish a guide, and if the views previously expressed in this cause, are correct, there can be very little doubt. In 6 *Paige*, 264, *Oakley* vs. *The trustees of Williamsburgh*, where the trustees were proceeding to dig down a street, the chancellor says: "if the trustees have no such powers as they have assumed to exercise, then this appears to be a very proper case for the allowance of an injunction, to restrain an illegal proceeding by them, to dig down and alter the grading of the street as established, which, as alledged in the bill, will be a material injury to the value of the property of these complainants." The cases cited, 2 *Johnson*, 463; *Belknap* vs. *Belknap*, 1 *Vesey*, 188; *Slush* vs. *Trustees of Morden college*; *Agar* vs. *The Regents canal com.*, *Cooper's Equity Rep.*, 77, *and* 6 *Paige*, 88, are also in point, and show that jurisdiction in this class of cases, has been in constant exercise.

The case of *Corning and others* vs. *Lowrie*, 6 *John. Ch. R.*, 440, is strictly analogous. This was a bill for an injunction to restrain the defendant from obstructing Vestry street, in the

city of New York, and averring that he was building a house upon that street, to the great injury of the plaintiffs, as owners of lots on, and adjoining, that street; and that Vestry street has been laid out, regulated and paved, for about twenty years. The chancellor distinguished this case from that of the *Attorney General* vs. *The Utica insurance company*, inasmuch as here was a special grievance to the plaintiffs, affecting the enjoyment of their property, and the value of it. The obstruction was not only a common or public nuisance, but worked a special injury to the plaintiffs, and upon these grounds the injunction was granted. I am unable to distinguish this case from the one under consideration.

It results, then, that this court, having jurisdiction of the subject matter, and being appealed to by those who, as they alledge, are suffering wrong and injury, and who have made a case coming clearly within the authority of adjudged cases, the duty of this court is imperative; it is one from which it dare not shrink, however much it may regret that this question has arisen.

It is but due, and of this the court is fully conscious, that the public officers should be sustained in the exercise of the powers which are granted them; but when appealed to, upon a question of individual rights, it can have no other duty but to apply the law to the case. It cannot be improper further to say, that in the prosecution of the work here complained of, it is beyond doubt that the board of commissioners have acted in the most perfect good faith.

A great variety of other questions have been raised and discussed, in the course of this laborious investigation. They have been intently and carefully considered, but not being material in the decision of this motion from the conclusion to which I have arrived, it is not deemed necessary to discuss them further in this preliminary stage of the cause.

The motion to dissolve the injunction must be denied.

Motion denied.